AARON A. WELCH, ADMINISTRATOR OF THE ESTATE OF FRANK A. WELCH, DECEASED, PLAINTIFF AND APPELLANT *v.* OSCAR NEPSTAD AND JAMES NEPSTAD, DEFENDANTS AND RESPONDENTS.

No. 9727.
Submitted March 21, 1958. Decided March 13, 1959.
337 Pac. (2d) 14.

66

Raymond F. Gray, D. A. Paddock, Missoula, for appellant.

Jardine, Stephenson, Blewett & Weaver, Great Falls, for respondents. John H. Weaver, Great Falls, argued orally.

MR. JUSTICE ADAIR:

The plaintiff, Aaron A. Welch, administrator of the estate of Frank A. Welch, deceased, brought this action against the defendants, Oscar A. Nepstad and James Nepstad, to recover damages for the death of plaintiff's son, Frank A. Welch,

alleged to have resulted from the negligent operation of a certain 1951 green Dodge pickup truck owned by the defendants and driven by their employee, Henry Dahlen, also called George Henry Dahlen.

The trial court granted defendants' motion for a judgment of nonsuit and dismissal of plaintiff's complaint. This is an appeal from that judgment.

The Pleadings—*Complaint*. The plaintiff's complaint herein was filed September 20, 1954, in the district court of Toole County, Montana. It states two separate causes of action. The first cause of action was brought under the provisions of section 93-2824, R. C. M. 1947. The second cause was brought under the provisions of section 93-2810, R. C. M. 1947.

In each cause of action the plaintiff separately states: That plaintiff is the duly appointed, qualified and acting administrator of the estate of Frank A. Welch, deceased; that at the times mentioned in the complaint the defendant, Oscar A. Nepstad and the defendant, James Nepstad, were engaged in the business of operating oil wells and oil leases and in farming large tracts of land situate near Kevin and Oilmont in the State of Montana as copartners; that at about two o'clock a.m. on September 20, 1953, Frank A. Welch, operating and driving a certain 1953 GMC pickup truck, was proceeding in an easterly direction on the south side of that certain oiled highway which extends easterly from Kevin, Montana, toward U. S. Highway 91; that at such time defendants' employee, Henry Dahlen, was then and there driving a certain 1951 Dodge pickup truck, the property of the defendants, but the title whereof stood in the name of the defendant, Oscar A. Nepstad; that said Henry Dahlen then and there drove said 1951 Dodge pickup truck in an easterly direction upon said oiled highway in such a negligent, reckless and careless manner that said Dodge truck collided with the 1953 GMC truck then being driven by Frank A. Welch, with such great force and violence that said GMC truck was tossed off the highway and into the waters adjacent thereto; that said Frank A. Welch was there-

by thrown and hurled about and in said GMC truck and grievously bruised, wounded and battered in and about his neck, back, limbs, chest and body and rendered helpless and unable to extricate himself from the waters into which he was thrown and that by reason thereof he suffered injuries, with accompanying pain, suffering and anguish which persisted until, and in consequence whereof, said Frank A. Welch drowned in said waters and died in said GMC truck.

In each cause of action plaintiff further states: That the defendants, with full knowledge that their employee, Henry Dahlen, had been drinking and that he was intoxicated, entrusted their said 1951 Dodge pickup truck to him; that defendants knew or in the exercise of due diligence, they should have known, that said Dahlen was too intoxicated to be entrusted with said vehicle and that defendants should have known that Dahlen would be likely to injure other persons driving upon said highway; that the defendants were then and there acting by and through Dahlen who then and there was acting in the course and scope of his employment and agency for the defendants; that said Dahlen did then and there drive and operate defendants' said Dodge pickup truck in a negligent, reckless and careless manner in that: (a) He failed to keep a proper or any lookout for other vehicles traveling upon said highway and particularly for said GMC truck so operated and driven by said Frank A. Welch; (b) he was at the time under the influence of intoxicating liquor; (c) he then and there drove said motor vehicle at a rate of speed much in excess of what was reasonable and proper considering the surface, grade, condition of travel and all the conditions and circumstances existing at the point of operation, to-wit, at the speed of approximately 70 miles per hour; (d) he operated said Dodge truck without having same under control as he approached the GMC truck then being driven by Frank A. Welch; (e) he failed to slow down the said Dodge truck; (f) he failed to apply the brakes on the said motor vehicle; (g) he failed to turn said Dodge truck to the left and away

from the GMC truck; (h) he failed to pass upon the left hand side of said GMC truck; (i) he failed to avoid colliding with the GMC truck; and (j) he recklessly and carelessly drove and operated said Dodge pickup truck into and against the said GMC truck, then being driven by said Frank A. Welch, with great force and violence.

Each cause of action further states: That the negligent acts of the defendants in permitting said Henry Dahlen to drive said Dodge truck while under the influence of intoxicating liquor and the above-enumerated negligent acts and omissions of defendants' said servant, agent and employee, Dahlen, proximately caused the aforesaid collision and the resulting death of Frank A. Welch.

The first cause of action further states: That at the time of the collision and killing, Frank A. Welch was a strong, healthy, able-bodied man of the age of 26 years; that he was steadily employed and earning $200 per month; that he was a resident of Toole County, Montana; that by order of the district court for the county made October 23, 1953, the plaintiff, Aaron A. Welch, was duly appointed administrator of the estate of said Frank A. Welch, deceased; that plaintiff duly qualified as such administrator; that letters of administration were duly issued to him; that such letters have not been revoked but are now in full force and effect; and that by reason of the above-enumerated negligent acts of the defendants said Frank A. Welch sustained damage and loss in the sum of $65,000.

The second cause of action further states: That at the time he was killed Frank A. Welch was a single man of the age of 26 years; that he died intestate with a life expectancy of approximately forty-two years; that he left surviving him as his heirs at law his father, Aaron A. Welch and his mother, Ruth Welch; that the decedent, Frank A. Welch, was an employed oil field worker and laborer, earning $200 per month; that by reason of his untimely death decedent's heirs at law, namely, his father and mother, have been deprived of nurture, support

and maintenance as well as the comfort, protection, society and companionship of their said son to their damage in the sum of $35,000, and that in addition thereto decedent's said parents were required to incur funeral expenses in the further sum of $560, no part or portion of which said sums have been paid by the defendants herein; and that by order of the district court for Toole County, duly made on October 23, 1953, the decedent's father Aaron A. Welch, was duly appointed and that he continues to be the duly appointed, qualified and acting administrator of his said son's estate.

*Motion to Strike.* The defendants interposed a motion to strike certain designated portions of the foregoing complaint which motion was denied.

*Demurrers.* Next defendants interposed general and special demurrers to the complaint and to each cause of action pleaded therein, which demurrers were overruled.

*Answer.* Thereafter, on April 13, 1955, defendants filed their answer to plaintiff's complaint wherein defendants denied every allegation in the complaint except as are specifically admitted in paragraph designated II of their answer, which paragraph reads as follows:

"II. Defendants, and each of them, admit that they were and now are copartners in the operation of an oil lease near Kevin, Montana; that U. S. Highway No. 91 extends in a northerly and southerly direction from Sunburst; that a certain public highway extends from Kevin in an easterly direction, where it intersects U. S. Highway No. 91; that on or about September 20th, 1953, Frank A. Welch was operating a 1953 GMC pickup truck in a general easterly direction; that said vehicle was involved in an accident with a 1951 Dodge pickup truck owned by defendant Oscar Nepstad and being driven by Henry Dahlen; and that said Frank A. Welch was killed, but defendants and each of them, specifically deny that said Henry Dahlen was at the time an employee or agent of either or both of them, and defendants, and each of them, further

specifically deny that they, or either of them, were in any way negligent.''

*Reply.* On April 25, 1955, the plaintiff filed his reply wherein he denied ''each and every allegation of new material'' contained in defendants' answer. .

Issues being joined, the cause came on regularly for trial before the Honorable R. M. Hattersley, district judge presiding, and a jury.

On the morning of February 16, 1956, being the opening day of the trial, defendants' counsel served, upon plaintiff's counsel, a copy of a proposed amended answer to plaintiff's complaint setting up for the first time and as an affirmative defense alleged contributory negligence on the part of the decedent, Frank A. Welch, which amended answer the trial court permitted defendants to file over the most strenuous objections of plaintiff's counsel.

*Motion for nonsuit.* At the trial, the plaintiff introduced the testimony of fifteen witnesses and then rested. Thereupon the defendants interposed an elaborate written motion for a judgment of nonsuit and for the dismissal of plaintiff's complaint. The motion was based upon fourteen separately numbered grounds listed in subdivisions designated 1 to 14 of the motion.

In subdivision 1 of their motion, defendants urged that ▮ plaintiff's complaint fails to state facts sufficient to constitute a cause of action. The disallowance of defendants' demurrers to plaintiff's complaint had long since correctly disposed of such contention and the trial court again ruled that such alleged grounds were lacking in merit.

In subdivision 2 of their motion, defendants contended that ▮ the opening statement of plaintiff's counsel failed to state facts sufficient in law to entitle plaintiff to any relief. Again, the trial judge correctly ruled against such contention.

In subdivision 14 of their motion, defendants contended ▮ that the evidence was insufficient to establish ''that Frank A. Welch was injured and survived for an appreciable

length of time." There was no merit in this contention as is shown by the uncontroverted testimony of the witnesses Burns and Stanchfield.

The witness, William F. Burns, testified that at the times here involved he was a mortician and also the county coroner of Toole County, Montana; that he and Dr. Palmstone, a physician, removed the bodies of Frank A. Welch and one King from the GMC pickup truck which was lying upside down in about two and one-half or three feet of muck, slime and water in a sump hole beside the road; that as to the condition of the body of Frank A. Welch, there was quite a severe bruise over the right eye or temple, there were bruises on both the chest and the back and the upper arms of the body, the left hand was quite badly bruised and the skin was broken on the fingers and his mouth and nostrils were filled with muck and mud; that in a case of death on the highway the coroner is required to make out a death certificate and that the witness Burns made out and filed in the Toole county court house such certificate showing that the death of Frank A. Welch was due to being "Drowned in mudhole by side of Highway due to auto accident."

The witness, Dr. Robert F. Stanchfield, a duly licensed and practicing physician and surgeon in Montana, in answer to a hypothetical question testified that in his opinion, "It is generally accepted that if a man were submerged in liquid or such a thing as that, that it would take 5 or 7 minutes until death ensues—for a man to drown—5 to 7 minutes."

In subdivision 3 to 13, both inclusive, of their motion for a judgment of nonsuit, the defendants contend that plaintiff's evidence is insufficient to show the employment of George Henry Dahlen by the defendants at the time and place of the accident. Upon the making of defendants' motion for nonsuit and prior to the oral argument thereof, the record shows the following proceedings, viz.:

"The Court: The principal proposition is the question of the employment of George Henry Dahlen by the defendants

at the time and the place of the accident. I would be willing to listen to argument on that point, if you care to argue.

"Mr. Weaver: On the employment?

"The Court: On the employment feature, as to whether or not he was acting under the relationship of master and servant at that time."

After hearing the oral arguments of counsel for the respective parties on this feature of the case, the trial court granted defendants' motion for dismissal of the complaint and nonsuit upon the grounds specified in subdivisions 3 to 13, inclusive, and denied the motion as to the grounds specified in subdivisions 1, 2 and 14 thereof.

*The Rules of Law.* This is a civil action, and it is sufficient ██ to make out a prima facie case if the plaintiff can show that the injury is more naturally attributed to the negligence alleged than to any other cause which the evidence might also tend to establish; no case should ever be withdrawn from the jury, declared by statute to be the sole judges of the facts, unless the evidence is susceptible of but one construction by reasonable men, and that in favor of the defendants, or where the evidence is in such condition that if the jury were to return a verdict in favor of the plaintiff, it would become the duty of the court to set it aside.

On a motion for nonsuit, every fact is deemed to be proved ██ which the evidence tends to establish, and the evidence is to be viewed in the light most favorable to the plaintiff, and if, so viewing the evidence, a prima facie case is made out, it follows that the trial court erred in granting the nonsuit. Nonsuit should never be granted unless it follows as a matter of law that recovery cannot be had upon any view of the evidence, including the legitimate inferences to be drawn from it.

Keeping the foregoing rules in mind, we shall review the pertinent testimony, on the issue of the employment or agency of George Henry Dahlen by the defendants Nepstad at the time and place of the accident, that was before the trial judge at the time the nonsuit was granted.

*The Evidence.* Plaintiff's second witness to take the stand was Nelson G. Bingham, of Whitlash, Montana, who testified: That he owns and operates a ranch and also an oil lease in Toole County, Montana; that Frank A. Welch was in the employ of the witness on September 19, 1953; that at approximately eight o'clock on the evening of that day he saw Frank A. Welch for the last time.

When asked as to the condition of the road between his ranch and Kevin on September 19, 1953, the witness, Nelson G. Bingham, testified as follows:

"A. It is a dirt road. It is a country road and at times it is rough and at other times comparatively smooth. *At that time of the year there had not been any recent rain so I would say the road was in average condition for a country road.*

"Q. If it were in average condition what would be a reasonable driving speed for a pickup truck over that distance? A. Oh, I would just imagine—*I would judge that you would not average over 40 miles an hour on that gravel road. A lot of it is gravel. Maybe 45 miles an hour.*

"Q. As Frank Welch's employer, Mr. Bingham, had you employed him over a period of time? A. Yes, he began working for us in the early part of the summer for drilling operations and he was employed as a tool dresser. * * *

"Q. Now, did he continue working as a tool dresser? A. No. *He was working at the ranch at the time this accident happened. He had worked at the ranch.* * * *

"Q. What were you paying him as a ranch employee?

"Mr. Weaver: *For what period of time?*

"Q. *And for what period of time?*

"Mr. Weaver: I am asking you. We object to the question on the ground that it is too indefinite.

"The Court: *What were you paying him per month and for what period of time?*

"Mr. Paddock: *That is what I asked him.*

"The Court: *Mr. Bingham, what were you paying him per month and for what time were you paying that? Over what*

*period of time? A. Well, $200.00 a month was the wage rate while he was working at the ranch. \* \* \**

"Q. What was the rate of wage on the 19th of September, 1953, Mr. Bingham? A. It was $200.00 a month."

*Interruption No. 1.* Here we interrupt the transcribed testimony of Nelson G. Bingham, the employer of Frank A. Welch, who lost his life while driving the GMC pickup truck to call attention to the fact that, while the employer witness Bingham was testifying on his direct examination concerning his employment of Frank A. Welch, he was interrupted first, by Mr. Weaver of counsel for defendants and next, by the trial judge, both of whom sought and insisted upon obtaining complete particulars as to the precise period of time for which the servant was employed and as to the exact amount of money per month the employer paid and as to the employee, Frank A. Welch's "rate of wage on the 19th of September, 1953."

The witness, Mrs. Beva L. Bingham, wife of the witness, Nelson G. Bingham, testified that on the evening of September 19, 1953, she was present when Frank A. Welch left the Bingham ranch at Whitlash and that, "He left the ranch after dark and I would say it was between eight and nine o'clock. We had our evening meal and the usual chores of the ranch hands were done with."

The witness, Aaron A. Welch, on his direct examination by ▇ Attorney Gray, of counsel for plaintiff, testified that he is an oil operator residing at Oilmont, Montana, where he has lived for approximately 28 years. In the midst of the direct examination by Mr. Gray and before same had been concluded, Attorney Gray was interrupted by Mr. Weaver, of counsel for defendants, who with the trial court's permission, boldly took the witness in hand and proceeded to pepper him with questions to which questions the witness made answer and by these answers and by this testimony so elicited by their counsel on his *direct* examination of the witness, the defendants became and are bound.

The record shows the following proceedings during the progress of the examination of the witness, Aaron A. Welch, viz.:

*Direct Examination*

By Mr. Gray:

"Q. Now, I want to ask you if you know Oscar Nepstad? A. Yes, I do.

"Q. And also James Nepstad? A. I do, yes.

"Q. And do you know George Henry Dahlen? A. Yes, sir.

"Q. Directing your attention to the *17th day* of September, 1953, I will ask you where you were? A. *I was in the field.*

"Q. And I will ask you on or about this date did you see George Henry Dahlen? A. *Yes, I did.*

"Q. And did you see Mr. James Nepstad? A. I did, yes.

"Q. Where did you see those two parties? A. *At the Wymont Lease.*

"Q. I will ask you if you know that George Henry Dahlen was then employed and working—

"Mr. Weaver: *To which we object. We are talking about the 19th and 20th of September, 1953, and counsel is talking about the 17th and that is remote.*

"The Court: *Objection sustained. Let us get down to the actual day the accident occurred.*"

*Interruption No. 2.* Here we interrupt the transcribed testimony of the witness, Aaron A. Welch, to call attention to the fact that when plaintiff's counsel, Mr. Gray, sought to question the witness, Aaron A. Welch, relative to the employment of George Henry Dahlen, who lost his life while driving the green 1951 Dodge pickup truck then owned by and registered in the name of the defendant, Oscar A. Nepstad, that neither defendant's counsel, Mr. Weaver, nor the trial judge deemed it either material or proper to ascertain or consider the particulars as to the full *period of time* that the servant Dahlen had been in the employ of the defendants Nepstad, and that the trial judge sustained Mr. Weaver's objections which urged that evidence tending to establish that Dahlen was employed by, and work-

ing for, the defendants Nepstad on Thursday, September 17, 1953, was entirely too "remote" from Saturday and Sunday the 19th and 20th of September 1953, to be shown, considered or admitted.

Of course, the plaintiff had the right to inquire into, and to develop particulars covering the *entire* period or periods of time that the servant Dahlen had worked for or been employed by the defendants, Oscar A. Nepstad and James Nepstad, and also to inquire into Dahlen's rate of wage or pay and as to whether Dahlen was employed by the month or otherwise. The jury had the right to hear and consider such evidence. To exclude it was prejudicial. Following the trial judge's ruling sustaining defendants' objection that evidence concerning Dahlen's work and employment on Thursday, Septmeber 17, 1953, was too "remote" to be considered or admitted, Mr. Gray's direct examination of the witness, Aaron A. Welch, was resumed as follows:

By Mr. Gray:

"Q. Do you know if George Henry Dahlen was working for James Nepstad on the 19th of September 1953?

"Mr. Weaver: Answer that yes or no. A. Yes.

"Q. Now, Mr. Welch, was he working for James Nepstad on the 19th of September, 1953?

"Mr. Weaver: *Pardon me. May I ask a few questions?*

"The Court: *You may.*"

*Interruption No. 3.* At this point and without either objecting to the interrogatory last above quoted or giving the witness, Aaron A. Welch, any opportunity to answer such question so put to him by plaintiff's counsel, Mr. Gray, Mr. Weaver, of counsel for defendants, interrupted Gray's direct examination of the witness and boldly barged in—took the witness away from plaintiff's counsel—made of such witness a witness for the defendants, and then proceeded to interrogate him as follows:

By Mr. Weaver:

"Q. Mr. Welch, where did you say you were on the 19th of September, 1953? A. I was in the field—the oilfield.

"Q. On the 19th of September, 1953?

"The Court: That was the date of the accident, as I understand it.

"Mr. Weaver: That was the day before this accident happened.

"A. *I was in the field the day before the accident.*"

By Mr. Weaver:

"Q. You were in Glacier Park on September 20th? A. Yes.

"Q. When did you leave Glacier Park? A. In the evening.

"Q. On what date? A. Well, that would be Saturday.

"Q. That would be September 19th, 1953? A. Yes.

"Q. Now, did you see James Nepstad on that day, the 19th of September, 1953?

"Mr. Gray: *We object to that, if the Court please, for the reason that it isn't necessary that he see James Nepstad in order to know that Dahlen was working.*

"Mr. Weaver: *That is well taken. I think, but I want to know how he knows.*

"The Court: *Well, the objection is overruled. Answer the question.*

"A. No."

*Erroneous Ruling.* Here, while defendants' counsel, Mr. Weaver, was continuing with his irregular direct examination of the witness, Aaron A. Welch, plaintiff's counsel, Mr. Gray, made a timely and proper objection to the last above-quoted interrogatory put to the witness by Mr. Weaver, which objection Mr. Weaver conceded to be "well taken," but nevertheless the trial judge overruled plaintiff's valid objection and directed the witness to "Answer the question." Such ruling and such irregular procedure were prejudicial to plaintiff's case.

Following the overruling of plaintiff's above objection, defendants' counsel, Mr. Weaver, resumed his examination of the witness, Aaron A. Welch, as follows:

By Mr. Weaver:

"Q. Did you see George Henry Dahlen on that day? A. No.

"Q. And do you know of your own personal knowledge where James Nepstad and George Henry Dahlen were on that day? A. *I know they were working.*

"Q. But you did not see them? A. No, sir.

"Q. And if you say they were working on that day that is not of your own personal knowledge—it is something you learned somwehere else? A. No, sir.

"Q. How do you know? A. *James Nepstad said right here in this courtroom and you heard him.*

"Q. And what you are saying is that is the basis for your knowledge, right. A. *Right.*

"Mr. Weaver: If the Court please, we object on the ground that it is hearsay.

"The Court: Well, if it might be termed an admission it is that of one of the defendants to the action. I suggest that it might be an admission against interest and if it is that it is that of one of the defendants to this action and which would take it out of—

"Mr. Weaver: That is not the case.

"Q. You don't know of your own personal knowledge, *within your own hearing* and observation, that George Dahlen was working for James Nepstad on September 19th, 1953, do you? A. *Yes, sir, I do.*

"Q. You know that? A. *I know he was working.*

"Q. Do you know whether he was working for him on September 20, 1953, at two o'clock A.M.? A. *Yes, sir.*"

*Interruption No. 4.* After taking the witness, Aaron A. Welch, away from plaintiff's counsel, Mr. Weaver put the above questions to the witness and obtained from him the above answers and testimony. By so doing, Mr. Weaver placed such testimony in the record and before the jury and the trial judge. After so doing, he objected to that which he had deliberately placed in the "record" on the ground that it is hearsay. This objection by Mr. Weaver to the testimony which his own

interrogatories adduced and placed in record was neither timely, proper nor of any avail. It did not and could not remove the damaging testimony from the record.

Defendants' counsel made his record and on such record he must stand. That record shows that the witness, Aaron A. Welch, on his direct examination conducted by Mr. Weaver, testified that he knew of his own personal knowledge and within his own hearing and observation "that George Dahlen was working for James Nepstad on September 19th, 1953 * * * and that he was working for him on September 20th, 1953, at two o'clock A.M."

Defendants' counsel, with the trial judge's permission, resumed his examination of the witness, Aaron A. Welch, as follows:

By Mr. Weaver:

"Q. At which time you were in Glacier Park? A. I would say yes.

"Q. I am not asking you what you would say, I am asking you if you know of your own personal knowledge that—

"Mr. Gray: *Is this cross-examination?*

"The Court: *I have permitted the attorney for the defendants to examine on that point to determine the position of your examination. Proceed, Mr. Weaver.*

By Mr. Weaver:

"Q. Now, Mr. Welch, you didn't see James Nepstad or George Henry Dahlen at any time on September 19th, 1953, did you? A. I did not.

"Q. Nor did you see either of them at any time on September 20th, 1953? A. I did not.

"Q. You had no conversation with either of them on that day? A. No, sir.

"Q. So you don't know of your own personal knowledge whether they were in the same state, do you? A. *Yes, sir; I do.*

"Q. You know that of your own personal knowledge? A. *Yes.*

"Q. When did you return from Glacier Park? A. I came back the day of the 20th.

"Q. What do you mean by your own personal knowledge, do you mean things you have heard? A. Well, yes.

"Q. All right. Now, you have heard some things here, have you not, and you are basing your answers on what you have heard, is that correct? A. *That was said right here in the courtroom.*

"Mr. Weaver: I move that *the answer* be stricken as not responsive.

"The Court: *It is stricken.*

"Q. Now answer the question with yes or no. A. Yes.

"Q. It is on the basis, is it not, and that is what you mean when you say of your own personal knowledge that George Dahlen was employed by James Nepstad on the 19th of September 1953? A. Yes.

"Q. That is based on something you have heard, isn't it? A. *Right.*

"Mr. Weaver: Now, if the Court please, we *renew* the objection.

"The Court: Objection sustained."

*Erroneous Ruling.* The "objection" which defendants' counsel here sought to "renew" and revive is that heretofore considered herein under the heading "Interruption No. 3" the objection being: "Mr. Weaver. If the Court please, we object on the ground that it is hearsay." This was but an idle objection made by defendants' counsel, Mr. Weaver, to testimony produced on his *direct* examination of the witness and placed in the record by Mr. Weaver in answer to numerous questions which he had put to the witness, Aaron A. Welch, without objection, and after Attorney Weaver had taken the witness away from Attorney Gray and made of such witness a witness for the defendants. Under the facts which here obtain, the original "objection" when first made by Mr. Weaver was idle and wholly lacking in merit as was his subsequent motion to "renew the objection." The attempt, by the trial court, to clear

the record; of the testimony so adduced by the direct examination by defendants' counsel of the witness, Aaron A. Welch, by sustaining an objection previously registered to numerous and divers questions already answered, was and is both erronous and abortive.

The witness, Robert H. Gillespie, testified: That at about four or five o'clock on Saturday afternoon, September 19, 1953, while at the service station just across the street from a bar or beer parlor in Kevin known as "Bert's Place" he saw George Henry Dahlen driving the green 1951 Dodge pickup truck, accompanied by some other person, engaged in hauling five or six barrels of garbage from "Bert's Place" to the city dump and then returning the empty barrels to "Bert's Place" where the barrels were unloaded. At that time, the witness Gillespie also observed that there was a gas barrel on the back end of the Dodge truck. After unloading the empty garbage barrels at "Bert's Place," the driver, George Henry Dahlen, came over to the service station where he talked with the witness Gillespie.

The defendant, Oscar A. Nepstad, when called by plaintiff as an adverse witness pursuant to the provisions of section 93-1901-9, R. C. M. 1947, was examined and testified, in part, as follows:

"Q. Mr. Nepstad, you are one of the defendants in this case, are you not? A. Yes, sir.

"Q. Directing your attention to the 19th day of September, 1953, I will ask you if during that day you were in the town of Kevin? A. Yes, sir.

"Q. What were you doing there? What time were you there? A. Oh, about four or five o'clock.

"The Court: In the afternoon? A. Yes.

"Q. How long did you stay in Kevin? A. Just stayed there a little while.

"Q. Did you see George Henry Dahlen there? A. *Yes, I did.*

"Q. As a matter of fact, you saw him later on that evening, didn't you? A. No, sir.

"Q. You talked to George Henry Dahlen? A. No, I didn't.

"Q. Didn't he ask you for some money there at Kevin? A. No, he didn't.

"Q. Where did you see him? A. Well, I seen him down at Bert's place.

"Q. There was a Dodge truck there at that time, wasn't there, Mr. Nepstad? A. What?

"Q. Did you see a Dodge truck in town at Bert's place? A. No, sir.

"Q. You deny that George Dahlen ever asked you for money that night? A. Yes, sir.

"Q. Do you know if George Henry Dahlen had his truck there that day? A. *No, he didn't have any there.*

"Q. How did he get there, if you know? A. *Well, he rode down with the foreman from Jim's place.*

"Q. How do you know that? A. Well, because I was there at Jim's place.

"Q. You brought him to town that day, didn't you? A. *No, the foreman brought him to town.*

"Q. What did he use to bring him to town? A. The International pickup.

"Q. Where did that come from? A. Come from Jim's place.

"Q. Is 'Jim's place' the Wymont Lease? A. Yes, sir.

"Q. And who has that lease? * * * A. O. A. and James Nepstad.

"Q. Now, Mr. Nepstad, you were there at that Wymont Lease in the afternoon when George Dahlen was there; is that correct? A. Yes, he was up there for a little while.

"Q. You were there when he went to Kevin, were you not? A. Yes, sir.

"Q. And later on in the afternoon you saw him in Kevin? A. Yes, sir.

"Q. But you didn't see the Dodge truck? A. *No, it wasn't there.*

"Q. Did you talk to him in Kevin? A. No, I didn't.

"Q. Where did you see him? A. *Well, I seen him around the streets and into Bert's place.*

"Q. *He was in Bert's place.* A. *Yes, sir.*

"Q. And you went into Bert's place? A. Yes, I went in there.

"Q. And you never talked to him?

"Mr. Weaver: Objected to as repetitious.

"The Court: It is sustained. He said that he didn't talk to him.

"Mr. Gray: That is all.

"Mr. Weaver: No examination.

"Whereupon the witness was excused."

Plaintiff's complaint alleges that at the times here involved the title to the described 1951 Dodge pickup truck, involved in the accident, stood and was registered in the name of the defendant, Oscar A. Nepstad, as the owner of such truck. These facts stand admitted in defendants' original answer and also in their amended answer herein.

After the defendant, Oscar A. Nepstad, had given his testimony, as above-quoted, the witness Arthur E. Tinsley, was placed on the witness stand. Tinsley testified: That he resides at Ferdig in Toole County, Montana, and works in the oil field there; that on Saturday, September 19, 1953, he worked all day and until about five o'clock in the afternoon when, after the completion of his work for the day, he went to Kevin where he arrived between seven and seven thirty p.m.: that he immediately went to a barber shop where he obtained a haircut, after which he repaired to the tavern known as "Bert's Place" where he met George Henry Dahlen, Walter L. Whitt and Dewey Majaris, and where they remained until about nine or ten p.m., when the four, riding in Whitt's automobile, left for Cut Bank, Montana, where they visited various beer parlors and bars until shortly after midnight when Whitt drove them back to Kevin; that they made their first stop in Kevin at a brand new bar operated by Bill Suda and known as "Bill's Place" which had just been opened for business that evening

and where free drinks were being served; that a few minutes before two a.m. on Sunday, September 20, 1953, "we kind of broke up and dissolved with the crowd." The witness Tinsley testified that he left Bill Suda's bar at "approximately two o'clock when they closed up."

It will be remembered that the defendant, Oscar A. Nepstad, placed on the stand as an adverse witness, had already testified: That he was in Kevin at about four or five o'clock on Saturday afternoon, September 19, 1953, at which time he saw George Henry Dahlen around the streets and down at and in "Bert's Place" but that he at no time talked to Dahlen; that at no time did Dahlen ask the defendant, Oscar Nepstad, for any money; that at no time did he see a Dodge truck at "Bert's Place" and that Dahlen did not have any truck in Kevin that day.

To impeach such adverse witness, Oscar A. Nepstad, who had so testified, Mr. Paddock of counsel for plaintiff, offered to prove by the witness, Arthur E. Tinsley, then on the stand, that while Tinsley, Dahlen and the other two men were riding in Whitt's automobile on the trip from Kevin to Cut Bank on Saturday evening, September 19, 1953, Henry Dahlen had related to those accompanying him that he, Dahlen, had asked the defendant, Oscar A. Nepstad, for an advance on his pay and that Oscar declined to pay him and told Dahlen he would have to get it from "Jimmie" referring to the defendant, James Nepstad.

During his direct examination, the following portion of a question was put to the witness, Arthur E. Tinsley, and the following proceedings had, viz.:

"Q. On your way to Cut Bank didn't any discussion regarding wages of Mr. George Henry Dahlin—

"Mr. Weaver: Just a minute! We would object to this, of course, as incompetent, irrevelant and immaterial. I am satisfied that what counsel has in mind is—

"The Court: Objection sustained. It is hearsay.

"Mr. Paddock: We would like to make an offer of proof.

"The Court: Don't make it in open court. We will have to go into chambers and—

"Mr. Paddock: I don't think we have progressed to the point where we can really do it. There is no objection to the type of testimony that—

"The Court: I considered it hearsay and not relevant and sustained the objection.

"Mr. Paddock: In that event we would like to make an offer of proof.

"The Court: Very well, we will go into my chambers."

In Chambers:

"The Court: The record will show that this offer of proof is being made in chambers, out of hearing of the jury, and that respective counsel are present. You may proceed with your offer of proof now.

"Mr. Paddock: The plaintiff offers to prove by the witness now on the stand that during the course of their trip from "Bert's Place" in Kevin to Cut Bank there was a discussion in the course of which George Henry Dahlen told the other passengers in the car that he had asked Oscar Nepstad for an advance on his pay, and that Oscar Nepstad told him that his bank account was overdrawn and that he would have to get it from Jimmie, and that further, Jimmie did give him the check. That is the offer of proof, your Honor.

"The Court: Any objection?

"Mr. Weaver: We object on the grounds that the evidence is incompetent, irrelevant and immaterial hearsay—no proper foundation laid for impeachment and no admission on any theory.

"The Court: I will sustain the objection. We will go back into court now."

The defendant, James Nepstad, also called by plaintiff as an adverse witness pursuant to the provisions of section 93-1901-9, R. C. M. 1947, was examined and testified in part, as follows:

By Mr. Gray:

"Q. You may state your name to the court and jury. A. James Nepstad.

"Q. You are one of the defendants in this action, are you not, Mr. Nepstad? A. Yes, I am.

"Q. Directing your attention to the 19th day of September, 1953, I will ask you if George Henry Dahlen was employed by you? A. No, sir.

"Q. Did he work for you on that day? A. No, sir.

"Q. You deny that he was working for you on the 19th day of September, 1953? A. Yes.

"Q. Was he working for you on the 18th? A. He had been working for *us* on the 18th. A. Yes.

"Q. *Why wasn't he working for you on the 19th?* A. *It rained that morning.*

"Q. Now, do you know of a Dodge truck that was involved in this accident? A. Yes.

"Q. Where was the Dodge truck on the 19th of September, 1953, Mr. Nepstad?

"Mr. Weaver: At what time?

"Mr. Gray: I said on the 19th of September, 1953, Mr. Weaver.

"The Court: What time of day?

"Q. Where was the Dodge truck on the morning of that day?

"Mr. Weaver: Objected to as irrevelant—

"The Court: No. Objection overruled.

"A. Well, I *presume* it was at my place, *but I'm not sure.*

"Q. As a matter of fact, it was at your place all day, wasn't it? A. *I think so.* * * *

"Q. Where were you from twelve o'clock noon on? A. I *think* I was around my home—around there somewhere.

"Q. You don't know for sure, but just *think* that? A. *I don't remember* being any other place.

"Q. *Where was the truck sitting?* A. *Well, it would be sitting right out in front of my house if it was sitting there, and I think it was.*

"Q. How did George Henry Dahlen get to Kevin, if you know?

"Mr. Weaver: On the 19th?

"Q. Yes, on the 19th. A. I *think* he went up with Mr. Overfelt.

"Q. You say you *think* he went with Mr. Overfelt. Do you know that he did or just *think* so? A. I didn't actually see him leave the place. That would just be hearsay—I didn't actually see him leave.

"Q. *Did you see George Henry Dahlen about five o'clock at night?* A. Approximately that time, yes—that evening.

"Q. *He was at your place?* A. *Yes.*

"Q. *He drew some money then?* A. *Yes.*

"Q. *And how did he get back to town after five o'clock?* A. *He drove back.* * * *

"Q. Drove back in what? A. The International pickup.

"Q. *Did he take the Dodge truck to Kevin?* A. *Yes.*

"Q. Was it the same evening? A. Yes.

"Q. Do you own a beer parlor in Kevin?

"Mr. Weaver: Objected to as incompetent, irrevelant and immaterial, and outside the scope of the pleadings and has nothing to do with the issues in this case. I thought we went over that before.

"The Court: Objection sustained.

"Q. This Dodge pickup that was over at your place on the afternoon of September 19th, 1953, was that the same Dodge pickup that was involved in this accident? A. Yes.

"Mr. Gray: That is all.

"Mr. Weaver: No question.

"Whereupon the witness was excused."

*Beer Parlor Ruling.* "Do you own a beer parlor in Kevin? This was a pertinent and proper question to be put to the cautious, vague, uncertain reluctant adverse witness, James Nepstad. It was a simple question that called for a simple "Yes" or "No" answer. Had the witness been in a position to truthfully answer "No" that would have ended the matter

so far as it concerned him except for the introduction by plaintiff of impeaching evidence.

On the other hand, had the defendant, James Nepstad, truthfully answered "Yes," the next question would have been, "Which beer parlor or tavern in Kevin do you own?" Then were the defendant witness to answer "Bert's Place," the relevancy and materiality of his testimony would have been quite apparent for it was from right in front of James Nepstad's dwelling on the Wymont Lease, that, late on the afternoon of September 19, 1953, George Henry Dahlen took the green 1951 Dodge pickup truck, owned by and registered in the name of Oscar A. Nepstad, and drove it to "Bert's Place" in Kevin where he used the vehicle in hauling the barrels of garbage from "Bert's Place" to the city dump following which he parked the truck at the south side of "Bert's Place" where it remained until about two o'clock in the morning of September 20, 1953, when Dahlen climbed into the truck and headed down the road in an easterly direction to return both the truck and himself to the home of James Nepstad on the Wymont Lease where both apparently belonged.

Whose business was being done by Dahlen in Kevin when late on Saturday afternoon, September 19, 1953, he used the truck in hauling the garbage from "Bert's Place?"

Whose business was being done by Dahlen, when at about two o'clock on Sunday morning, September 20, 1953, Dahlen took the Dodge truck from the south side of "Bert's Place" headed east toward the Wymont Lease from whence he had driven the truck on the preceding afternoon?

The plaintiff had the right to inquire of the defendant, James Nepstead, what if any interest he had in the beer parlor or bar known as "Bert's Place," and it was error for the trial judge to refuse to allow such inquiry to be made.

The witness, Walter L. Whitt, called to the stand after the defendants, Oscar A. Nepstad and James Nepstad, had given their above-quoted testimony, testified: That he resides at Ferdig, Montana, where he is employed as a roustabout for the

90

Texas Pacific Oil Company; that at about ten o'clock on Saturday evening, September 19, 1953, the witness Whitt accompanied by George Henry Dahlen, Dewey Majaris and Arthur E. Tinsley, left Kevin in Whitt's automobile and drove to Cut Bank, Montana, where they visited and had drinks at a number of beer parlors and taverns; that at about twelve o'clock midnight the group returned to Kevin where they arrived about thirty minutes past midnight; that on the return trip from Cut Bank, George Henry Dahlen fell asleep in Whitt's automobile which, on arriving at Kevin, was stopped and parked near a new bar in Kevin owned by Bill Suda and known as "Bill's Place" which was then having its grand opening night with free drinks for everybody; that Whitt, Majaris and Tinsley went into "Bill's Place" and entered into the festivities there in progress, but that Dahlen had "had it" and that he continued to sleep in Whitt's automobile; that at about ten or fifteen minutes before the two o'clock a.m. closing time for all bars, Whitt returned to his automobile, wherein Dahlen was still sleeping, and drove to the bar in Kevin known as "Bert's Place" at the south side whereof Dahlen had parked defendants' 1951 green Dodge pickup truck earlier in the evening; that on arriving at the parked Dodge truck, Whitt awakened Dahlen, let him out of Whitt's automobile and observed Dahlen climb into the Dodge truck; that thereupon Whitt took the road extending easterly from Kevin and started for his home at Ferdig, at which time he was following a GMC pickup truck occupied by Frank A. Welch and a man named King with Welch driving; that at the Big West loading rack on the outskirts of Kevin, Whitt made a brief stop at which place the green 1951 Dodge pickup truck, driven by George Henry Dahlen, passed him proceeding easterly and moving fairly fast; that Whitt continued down the road following both pickup trucks, the GMC and the Dodge, the lights of which he could see moving as the trucks proceeded down the road; that the witness estimated that the Dodge truck driven by Dahlen was traveling between 55 and 60 miles per hour just prior to

the accident; that he observed the Dodge truck overtake and crash into the rear end of the GMC truck then driven by Frank A. Welch at which time Whitt's automobile was about 200 feet to the rear of the Dodge truck and that the place on the road where the collision occurred is about seven-tenths of a mile east of the city limits of Kevin.

As a result of the collision, the GMC truck was tossed off the highway, and its two occupants, Frank A. Welch and King, were trapped and drowned. Dahlen riding in the Dodge truck was trapped and burned to death.

When asked to describe what happened when the Dodge truck driven by Dahlen hit the GMC truck driven by Welch, the lone eyewitness Whitt testified:

"A. Well, he hit this pickup and it throwed the GMC in the air and it lit and rolled over and rolled into this mud hole there, and Dahlen's truck turned over and rolled and the gas came out of the tank and set it afire from the sparks sliding down the highway.

"Q. What did you do? A. I tried to help Dahlen out and I couldn't do no good so I went back to the plant and got Delwo and we went out and tried to help the other two from the GMC pickup but we couldn't do any good and so I went back to the plant and got a fire extinguisher or two and the two people from the plant came down with me."

The witness, Robert H. Gillespie, testified: That somewhere near the hour of two a.m. on Sunday, September 20, 1953, in response to a call, he drove in his own truck from Kevin to the scene of the fatal accident; that he there used his truck to pull the GMC pickup from the sump, muck and waters beside the highway into which the GMC pickup truck had been hurled so as to remove the bodies of Frank A. Welch and King therefrom; that thereafter Gillespie used his truck to haul both the Dodge pickup and the GMC pickup from the scene of the accident to the garage in Kevin; that the Dodge pickup was the same Dodge truck that he had seen Dahlen driving in Kevin at about four or five o'clock on Saturday afternoon, Septem-

ber 19, 1953, and which he had seen "coming across the tracks with garbage barrels on it and * * * a gas barrel on the back end of it," but that when viewed by him at the scene of the accident, the Dodge truck had "just the gas barrel and the pump" on it, and that at such time the garbage barrels were missing.

*Offer of Proof re "Bert's Place."* While the witness, Aaron A. Welch was on the stand, an offer of proof was made and disallowed and the following proceedings had, viz.:

"Mr. Gray: Now, if the Court please, I anticipate some objections here and I think it would probably save time—I would like to make an offer of proof.

"Mr. Weaver: Satisfactory to us.

"The Court: Very well, we will go into my office.

"Whereupon the jury was duly admonished and the Court recessed."

In Chambers:

"The Court: The record will note respective counsel present and that this offer of proof is being made outside the hearing of the jury. You may proceed, Mr. Gray.

"Mr. Gray: Comes now the plaintiff in this case and offers to prove by the witness now on the stand that a certain establishment referred to by the various witnesses as "Bert's Place" is owned partially by James Nepstad and that the parties involved in this action have property to the west and to the east of Kevin where this tavern is located and that it is the custom of employees of both of the defendants to stop for periods of time at this tavern and then proceed on with their work.

"Mr. Weaver: We object to that as incompetent, irrelevant and immaterial. It seems to me that it is almost identical to the offer of proof made yesterday.

"The Court: I don't see where a custom of that kind is admissible in evidence.

"Mr. Weaver: We object further for the reason that it involves issues not in this case regarding Bert's place.

"The Court: The objection is sustained.

"Mr. Gray: I would like to make another offer of proof by the witness on the stand that the place referred to by the various witnesses as Bert's place is partially owned by one of the defendants in this case—

"Mr. Weaver: Which one?

"Mr. Gray: James Nepstad.

"Mr. Weaver: We make the same objection.

"The Court: The same ruling by the Court. The objection is sustained. We will return to the courtroom now."

We find that the trial court erred: In denying the foregoing offer of proof; in granting defendants' motion for nonsuit; in dismissing the jury and in rendering and entering judgment for the defendants and against the plaintiff. The order granting the nonsuit is vacated, the judgment of the trial court is set aside and reversed, and the cause is remanded to the district court for further proceedings not inconsistent with this opinion. It is so ordered.

MR. JUSTICE CASTLES, and THE HONORABLE W. R. FLACHSENHAR, District Judge, concur.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICE ANGSTMAN, concur in the result but not with all that is said in the foregoing opinion.